## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **HANNAH FINNEGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Case No. 3:20-cv-00218-GCS** |
| **KEVIN KINK, RUSSELL GOINS, ROBERT WALKER, BRANDON DEWEESE,** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **ILLINOIS DEPARTMENT OF CORRECTIONS,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM & ORDER</u>

**SISON, Magistrate Judge:**

Pending before the Court are Defendants' Motions for Summary Judgment. (Doc. 209); (Doc. 211). Defendant Robert E. Walker ("Walker") filed his Motion for Summary Judgment and Memorandum of Support on June 26, 2023. (Doc. 209, 210). Defendants Brandon DeWeese ("DeWeese"), Russell Goins ("Goins"), and Kevin Kink ("Kink") filed their Motion for Summary Judgment on June 27, 2023. (Doc. 211). Plaintiff filed her Responses in Opposition to the Motions for Summary Judgment on July 25, 2023. (Doc. 214, 215). Defendants filed their Replies in Support on August 8, 2023. (Doc. 216, 218). For the reasons delineated below, the Court **DENIES** Defendant Walker's Motion for Summary Judgment (Doc. 209), and **GRANTS IN PART** and **DENIES IN PART** the

Motion for Summary Judgment filed by Defendants Kink, Goins, and DeWeese (Doc. 211).

## PROCEDURAL HISTORY

Plaintiff Hannah Finnegan, an inmate of the Illinois Department of Corrections ("IDOC") housed at Lawrence Correctional Center ("Lawrence") brought this suit pursuant to 42 U.S.C. § 1983. (Doc. 1, 14, 67, 133). Plaintiff, a transgender woman, claims that on or about June 21, 2018, she was moved from disciplinary housing to general population and placed with another individual in custody. (Doc. 67). Shortly after transfer into the new cell with inmate Justin Colapietro ("Colapietro"), Plaintiff alleges that Colapietro sexually assaulted her. *Id.* Plaintiff asserts that Defendants violated her Eighth Amendment rights by exposing her to a substantial risk of serious physical injury and failing to protect her. (Doc. 16).

Plaintiff filed this action *pro se* on February 26, 2020.[1] (Doc. 1). Plaintiff's First Amended Complaint against Defendants Kink and Goins survived screening on July 24, 2020. (Doc. 16). On November 11, 2020, Defendant Walker was added as a Defendant pursuant to Plaintiff's Second Amended Complaint. (Doc. 67). On April 9, 2021, Defendant DeWeese was added as a Defendant pursuant to Plaintiff's Third Amended Complaint. (Doc. 133).

---

[1]      Attorneys Melinda Longford Power and Elizabeth Mazur entered their appearances for Plaintiff on June 25, 2020, and July 7, 2020, respectively. (Doc. 10); (Doc. 13).

BACKGROUND

In May 2018, Plaintiff was transferred from Centralia Correctional Center to Lawrence. (Doc. 210, Exh. A, p. 8). Plaintiff was first housed in a restrictive housing unit, also known as a segregation unit, because she arrived on a disciplinary transfer. *Id.* at p. 19-21. Plaintiff remained in the same cell while in the segregation unit and did not have a cellmate. *Id.* On June 21, 2018, Plaintiff was transferred from the segregation unit to general population housing and placed in R6, C-wing, cell 6 (R6:CU:06). (Doc. 210, Exh. B, p. 30). Plaintiff was placed in the cell with inmate Colapietro. (Doc. 210, Exh. C, p. 56, 57). Plaintiff alleges that Colapietro sexually assaulted her while she was housed in the cell with him on June 21, 2018. (Doc. 210, Exh. A, p. 37-39).

At Lawrence, when an individual in custody is transferred from disciplinary housing to the general population, the placement officer decides the cell assignment and the assignment of cellmates. (Doc. 210, Exh. E). The decisions for placement are made, and relevant cell change forms are sent out the day before the moves occur. (Doc. 210, Exh. C, p. 42, 43). The placement officer would receive a segregation complete form from the segregation lieutenant for those leaving the segregation unit the next day. (Doc. 210, Exh. B, p. 27). Upon receiving this form, the placement officer would look at the individual's placement tag, noting their age, height, weight, and affiliation with security threat groups. *Id.* The changes would be documented on a daily cell change sheet in IDOC's online Offender 360 ("O360") system. *Id.* at p. 29. Placement officers are supposed to look up the inmate on O360 before making a cell assignment. (Doc. 210, Exh. C, p. 13). Upon arrival, individuals in custody are routinely looked up on O360, and all pertinent

information from O360 would be placed on the placement tag during its creation. *Id.* at p. 13, 32.

IDOC's sexual abuse prevention program includes the vulnerable designation, which is set forth in IDOC Administrative Directive 04.01.301. (Doc. 213, Exh. 2). Under A.D. 04.01.301, vulnerable prisoners are identified by IDOC's Chief of Mental Health as someone who has been a victim of or is vulnerable to sexual abuse in a correctional setting. *Id.* A.D. 04.01.301 requires vulnerable prisoners to be single-celled unless/until a specific proposed cellmate is screened and approved by prison administrators. *Id.* The vulnerable designations would be indicated in O360. *Id.* Plaintiff claimed that her vulnerable designation has been reflected in O360 continuously since 2015. (Doc. 213, Exh. 1, p. 25). Plaintiff's Offender Special Placement Double Cell Assessment ("Form 303") for disciplinary housing also indicated her vulnerable designation and transgender identity, thus indicating that double celling was not recommended. (Doc. 213, Exh. 4).

In 2018, Colapietro was incarcerated for predatory criminal sexual assault and possession of a shank in a penal institution, and he had a long disciplinary history in IDOC, including a history of violent assaults. (Doc. 213, Exh. 5, p. 99, 103). As of June 21, 2018, Colapietro was not deemed a sexual predator by the mental health staff at Lawrence. (Doc. 211, Exh. 4, p. 88). If Colapietro had been screened as a potential cellmate for Plaintiff in June 2018, he would not have been approved. (Doc. 211, Exh. 8, p. 145, 146).

A.   *Defendant Robert Walker*

Defendant Walker was the placement officer at Lawrence on June 21, 2018. (Doc. 210, Exh. B, p. 9). On June 20, 2018, Walker sent a daily cell change email to Co-Defendants DeWeese, Goins, Kink, and sixty other Lawrence personnel. (Doc. 211, Exh. 9). The email contained a daily cell movement sheet, which did not indicate whether Plaintiff was transgender or deemed vulnerable on June 20 or 21, 2018, or whether Plaintiff was to be single or double-celled on June 21, 2018. *Id.* at p. 2. Defendant Walker made Plaintiff's housing change on O360 at 8:32 a.m. on June 21, 2018. (Doc. 210, Exh. B, p. 30, 31).

Defendant Walker claimed he did not know that Plaintiff was marked as vulnerable when he placed Plaintiff in R6:CU:06 on June 21, 2018. (Doc. 210, Exh. B, p. 30, 42). Defendant Walker stated that he relied solely on the placement tag to determine whether Plaintiff was vulnerable, and he believed that Plaintiff's placement tag did not indicate that she was vulnerable. (Doc. 210, Exh. C, p. 50, 51). Walker also stated that he did not create Plaintiff's placement tag, as it would have been created when she arrived at the facility. *Id.* at p. 37. In addition, Walker asserts that he had no access to Plaintiff's Form 303 before June 21, 2018. (Doc. 210, Exh. B, p. 43, 48). Plaintiff's IDOC records use her legal name, John Finnegan, and Walker had not seen Plaintiff in person until he found out about the instant suit. (Doc. 210, Exh. C, p. 110, 111; Doc. 210, Exh. D; Doc. 210, Exh. F). Walker also did not know Colapietro before June 21, 2018. (Doc. 210, Exh. B, p. 33).

Plaintiff claims that Walker knew Plaintiff's vulnerable designation, which is indicated in O360 (Doc. 215, p. 11). Plaintiff claimed that Walker at least looked at O360 when he decided to double cell Plaintiff on June 20, 2018, and when he went into O360 to

formally change Plaintiff's cell placement on the system on June 21, 2018. (Doc. 213, Exh. 1, p. 24, 25; Doc. 213, Exh. 3, p. 28, 30; Doc. 213, Exh. 5, p. 85-87; Doc. 211, Exh. 7, p. 35, 36). Plaintiff also believes that Walker had access to Plaintiff's Form 303 and would have seen that Warden Kink decided that Plaintiff should be single-celled. (Doc. 211, Exh. 7, p. 27, 35; Doc. 211, Exh. 4, p. 49, 50; Doc. 211, Exh. 8, p. 65-73). In addition, Plaintiff claims that her vulnerable designation would have been indicated on her placement tag in June 2018, and Plaintiff notes that Walker admitted this during the internal affairs interview on September 14, 2018. (Doc. 210, Exh. C, p. 54-56). Defendant Walker also admitted that he knew of Colapietro before June 21, 2018, as he had handled Colapietro's cell change requests and had overheard other IDOC staff's negative opinions of him. (Doc. 210, Exh. C, p. 66-69).

**B.    *Defendant Brandon DeWeese***

Defendant DeWeese was a correctional lieutenant at Lawrence in May and June 2018. (Doc. 211, Exh. 4, p. 10). Correctional lieutenants oversee the "zones" assigned to them during the shifts. *Id.* at p. 15, 16. DeWeese was Defendant Walker's direct supervisor. *Id.* at p. 27. DeWeese did not work at Lawrence on June 20, 2018. *Id.* at p. 32. On the 7 a.m. to 3 p.m. shift on June 21, 2018, Defendant DeWeese was the Zone 7 lieutenant, also known as the segregation lieutenant, which included the segregation unit and the Placement Office. *Id.* at p. 15-17.

Plaintiff claims that before June 21, 2018, Defendant DeWeese knew she was transgender and designated vulnerable. (Doc. 214, p. 6). Plaintiff stated that Defendant DeWeese had personal interaction with her when she was in his housing unit, had access

to her Form 303, and had her vulnerable designation listed on a tag in his office. (Doc. 210, Exh. 2, p. 43-46; Doc. 211, Exh. 4, p. 49, 54, 55, 59, 60; Doc. 211, Exh. 8, p. 59-61; Doc. 213, Exh. 12, p. 36). Plaintiff alleges that DeWeese did not inform Defendant Walker of her vulnerable designation, did not give Walker Plaintiff's Form 303, and did nothing when he received the June 20, 2018, cell change email. (Doc. 210, Exh. B, p. 48; Doc. 211, Exh. 4, p. 38, 45-50). Plaintiff argues that by doing so, Defendant DeWeese failed to take reasonable steps to abate a substantial risk of serious harm to Plaintiff. (Doc. 214, p. 13, 14).

Defendant DeWeese, as Zone 7 lieutenant, noted that he only made decisions about segregation placement and had nothing to do with the Placement Office unless Placement Office personnel asked for help or had an issue. (Doc. 211, Exh. 4, p. 16; Doc. 211, Exh. 5, p. 21, 22, 24; Doc. 211, Exh. 6, p. 13). DeWeese claims that Walker did not contact him about the June 21, 2018, placement, and he was not involved in it. (Doc. 211, Exh. 4, p. 38). Defendant DeWeese asserts that he did not know that Plaintiff was transgender in May and June of 2018. *Id.* at p. 58. DeWeese also stated that he was not at Lawrence on June 20, 2018, when the cell assignment at issue was decided, and he did not physically transfer or escort Plaintiff from her cell in segregation to her cell in the general population on June 21, 2018. *Id.* at p. 3-16, 31, 32.

## C.   *Defendant Russell Goins*

Defendant Goins was an Assistant Warden of Operations ("AWO") at Lawrence in June 2018. (Doc. 211, Exh. 7, p. 6). The AWO supervises the security of the facility, as

well as the barbershop, maintenance, Bureau of Identification, laundry, and placement. *Id.* at p. 8, 9.

Plaintiff argues that Defendant Goins held a supervisory role as the AWO, was aware of the importance of placement decisions, and was responsible for ensuring that Walker knew his responsibilities. (Doc. 211, Exh. 8, p. 8, 9, 147). Plaintiff claimed that Defendant Goins knew that the placement office was understaffed, and he failed to ensure Walker's understanding of his responsibilities or the oversight of placement. (Doc. 210, Exh. C, p. 131, 132; Doc. 211, Exh. 7, p. 19).

Defendant Goins claims he was not contacted about the placement decisions and was not involved in the June 21, 2018, placement. (Doc. 211, Exh. 7, p. 12, 13). Defendant Goins argues that overseeing placement does not make him automatically liable for actions or inactions of Placement Office personnel. (Doc. 211, p. 9). Defendant Goins also stated that he typically did not open daily cell change emails, so he probably did not open the June 20, 2018, email from Defendant Walker. (Doc. 211, Exh. 7, p. 66).

D.    *Defendant Kevin Kink*

Defendant Kink was the Chief Administrative Officer ("Warden") of Lawrence in June 2018. (Doc. 211, Exh. 8, p. 7). Defendant Kink argues that he made no decision in the June 21, 2018, placement of Plaintiff. *Id.* at p. 157. Defendant Kink concurred in the determination that Plaintiff was to be single-celled in the segregation unit on May 29, 2018. (Doc. 213, Exh. 4).

Plaintiff argues that Defendant Kink knew her vulnerable transgender status and that she needed to be single-celled but failed to protect her regardless of this subjective

knowledge of risk. (Doc. 214, p. 14; Doc. 211, Exh. 8, p. 65-73). Plaintiff argues that as a Warden, Kink should inform security staff, including Defendant Walker, of her vulnerable status. (Doc. 213, Exh. 12, p. 19). Plaintiff claims that she wrote a letter to Defendant Kink on June 6, 2018, expressing her safety concerns upon being transferred from segregation to the general population, and specifically the fears of suffering potential sexual assault from being locked in a cell with other intimates, but she alleges that Kink did nothing in response. (Doc. 1, p. 14).

E.    *Plaintiff's Grievance Record and Identification of "John Doe" Defendants*

Plaintiff filed her first grievance regarding the June 2018 assault on August 8, 2018. (Doc. 210, Exh. F, p. 3-4). Therein, Plaintiff described the events leading up to the assault and expressed concerns about Colapietro's sexually transmitted infection ("STI") status. *Id.* at p. 4. Given these concerns, Plaintiff requested an STI screening and noted that she would feel safer in a single cell. *Id.* at p. 3. Plaintiff filed her second grievance regarding the assault on August 12, 2018. *Id.* at p. 5-6. Plaintiff requested the following as relief: "*Who was involved in deciding to place me in R6-CU-06" with [Colapietro]*? What was the reasoning behind it? Insurances something similar will never happen again in IDOC to me or anyone else. Declarations and Apology." *Id.* (emphasis added). The ARB reviewed both grievances together on September 19, 2018. *Id.* at p. 1. The ARB determined that Plaintiff's grievances were "moot" because the allegations were currently being investigated. *Id.* The ARB noted that Plaintiff would be notified by the facility of the outcome of the investigation. *Id.* The Director of the ARB then concurred with the Board's recommendation on September 24, 2018. *Id.*

Defendant Walker underwent an investigative interview about Plaintiff's assault on September 14, 2018. (Doc. 224, Exh. 1). The report stated that during the interview that Walker "was unsure how Finnegan got put into a cell with Colapietro because Finnegan ha[d] a tag marked vulnerable on the placement board." *Id.* at p. 2. Additionally, the report notes that Walker stated, "that if he placed Finnegan into a cell with another inmate it was by total accident." *Id.* An Administrative Hearing took place on October 31, 2018. (Doc. 224, Exh. 2). The Employee Review Hearing Office found that there was credible evidence that C/O Walker violated employee directives on June 21, 2018. *Id.* at p. 2. During the hearing, Walker allegedly stated the following:

> After I was interviewed, I have thought about this. I was asked if it was clearly marked, and I was not sure. Now I know he is clearly marked as vulnerable. This information comes from the MHP as an outlook to placement and we tag them on the board with a green marker. My name is on it and I did it.

*Id.*

Plaintiff filed her lawsuit in this case on February 26, 2020. (Doc. 1). By June 25, 2020, Plaintiff had obtained counsel. (Doc. 10). On July 16, 2020, Plaintiff – through her attorneys – filed a Motion for Leave to Serve A Subpoena to Identify Defendants Before the Statute of Limitation Runs. (Doc. 15). On September 1, 2020, while waiting on the Court to rule on the Motion, Plaintiff's counsel emailed an Assistant Attorney General ("AAG") who recently appeared in the case and requested voluntary production of the materials Plaintiff sought in her motion. (Doc. 213, Exh. 10).

By September 8, 2020, the AAG filed a response to Plaintiff's Motion, objecting on the basis that the discovery was overbroad, but stated that she would nevertheless

voluntarily work with Plaintiff's counsel to identify the appropriate defendants. (Doc. 34, p. 3-4). On September 10, 2020, the AAG produced to Plaintiff a copy of the IDOCs Internal Affairs ("IA") File for the underlying incident and those materials identified Robert Walker as having made Plaintiff's cell placement. *Id.* Neither Plaintiff nor her Counsel were aware of Walker's involvement until disclosure of the IA report. (Doc. 34, Exh. 9); (Doc. 34, Exh. 10).

After obtaining the IA file, Plaintiff's counsel continued to seek out more information from IDOC about possible defendants, but IDOC would not voluntarily provide them with the information. *See, e.g.*, (Doc. 34, Exh. 10) (referencing emails dated 9/22/20 and 9/23/20). By October 10, 2020, the Court entered a scheduling order. (Doc. 64). Among other things, the Order directed the parties to share information to help Plaintiff identify "John Doe" defendants. *Id.* In that same order, the Court denied Plaintiff's Motion for Discovery as moot. *Id.* at p. 7. (noting that "[i]n light of the deadlines set in this Order regarding identification of unknown parties, Plaintiff's Motion for Leave to Serve a Subpoena to Identify Defendants (Doc. 15) is DENIED as MOOT.").

Following entry of the Court's October 10th Order, Plaintiff's counsel initiated a "meet and confer" with Defendants' counsel about the fact that the case did not involve "John Does" in the usual sense.  Usually, Plaintiffs seek the identity of John Doe defendants for the purposes of adding them as defendants. In this case, Plaintiff lacked information about why or how the celling decision that led to her assault was made. Plaintiff renewed her requests for depositions during the meet and confer meetings. *Id.* Ultimately, Defendants would not agree to the depositions Plaintiff sought.

On January 25, 2021, Plaintiff filed a renewed motion for limited discovery after meet and confer efforts failed. On February 8, 2021, the Court granted Plaintiff's Motion, allowing sixty days for the depositions to proceed, and setting a deadline of April 11, 2021, for Plaintiff to file an amended complaint. (Doc. 103). Having worked diligently to identify Defendant DeWeese through depositions, Plaintiff filed her last amended complaint on April 9, 2021. (Doc. 124).

## LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in fact-

finding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

DISCUSSION

*A.*    *Statute of Limitations Defenses*

Defendants assert that Plaintiff's claims against Defendants Walker and DeWeese are barred by the applicable statute of limitations. (Doc. 210, p. 10-13); (Doc. 211, p. 11-13). Further, they allege that her claims against Walker and DeWeese cannot be saved by the relation back doctrine. *Id.* In response, Plaintiff argues that her claims against Walker and DeWeese were filed within the applicable statute of limitations because the period tolled as she pursued her administrative remedies under the Prison Litigation Reform Act ("PLRA"). (Doc. 215, p. 17-19). Alternatively, Plaintiff believes that the doctrine of equitable tolling should apply to her claims against Walker and DeWeese. (Doc. 214, p. 19-20); (Doc. 215, p. 19). The Court agrees with Defendants regarding tolling under the PLRA. However, the Court finds that the doctrine of equitable tolling should apply, which saves Plaintiff's claims against DeWeese and Walker.

Claims brought pursuant to § 1983 borrow the statute of limitations from the state in which the alleged violation occurred. *See Ashafa v. City of Chicago*, 146 F.3d 459, 461 (7th Cir. 1998). Illinois has a two-year statute of limitations for personal injury claims. *See* 735 ILL. COMP. STAT. § 5/13-202. Thus, the applicable statute of limitations for § 1983 claims arising in Illinois is two years. *See Woods v. Illinois Dept. of Children and Family Services*, 710 F.3d 762, 766 (7th Cir. 2013).

Federal Courts also borrow the forum state's principles of tolling. *See Smith v. City of Chicago Heights*, 951 F.2d 834, 839-840 (7th Cir. 1992). Illinois requires tolling by statute where "the commencement of an action is stayed by an injunction, order of the court, or

statutory prohibition." 735 ILL. COMP. STAT. § 5/13-216. Because the Prison Litigation Reform Act ("PLRA") requires inmates to exhaust their administrative remedies prior to filing suit under § 1983, the limitations period must be tolled while a prisoner completes the administrative grievance process. *See, e.g.*, 42 U.S.C. § 1997(e)(a) (noting that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted."); *see also Johnson v. Rivera*, 272 F.3d 519, 521 (7th Cir. 2001).

Defendants Walker and DeWeese assert that tolling under the PLRA did not begin until Plaintiff filed her grievance reporting the assault. (Doc. 210, p. 11); (Doc. 211, p. 11-13). Their position is that Plaintiff's statute of limitations began running on June 21, 2018 (the date of Plaintiff's assault) and did not begin to toll until August 8, 2018 (the date she filed her first grievance). *Id.* Plaintiff, on the other hand, believes that her claims against Defendants tolled from June 18 through September 24, 2018, when Plaintiff concluded the grievance process. (Doc. 214, p. 18); (Doc. 215, p. 17-19).

Defendants submit two cases that squarely confront the issue of claim accrual and tolling. In *Hatch v. Briley*, the Seventh Circuit recognized that a Plaintiff's claim accrues when the victim knowns (or should know) that he has been injured. Case No. 05-3204, 230 Fed. Appx. 598, 599 (7th Cir. April 19, 2007) (unpublished). The court recognized this is distinct from tolling, and that tolling "does not delay the claim's accrual." *Id*. This holding was reiterated by this Court in *Walker v. Porter*, wherein the Court noted that "the tolling period starts when a prisoner files his grievance and ends when the administrative review process is over." Case No. 21-cv-1171-NJR, 2023 WL 403946, at *4 (S.D. Ill. Jan. 25,

2023).

Accordingly, the Court finds that Plaintiff's claims accrued on the date of her assault – June 18, 2018. However, tolling began on August 8, 2018, and then ended on September 24, 2018 – the date the ARB director affirmed the Board's determination. Thus, the fifty days between the date of the incident and the date when Plaintiff filed her August 8, 2018, grievance count towards the two-year statute of limitations. As such, 680 days remained in Plaintiffs two-year statute of limitations once she received notice of the ARB's final determination. Accordingly, the two-year statute of limitations period elapsed on August 4, 2020.

However, the Court agrees with Plaintiff that the doctrine of equitable tolling should apply to the instant case.[2] The doctrine of equitable tolling "pauses the running of, or 'tolls' a statute of limitations when a litigant has pursued his rights diligently, but some extraordinary circumstance prevents him from bringing a timely action." *Xanthopoulos v. United States Department of Labor,* 991 F.3d 823, 831 (7th Cir. 2021) (quoting *Madison v. United States Department of Labor,* 924 F.3d 941, 946-947 (7th Cir. 2019)). To satisfy the second element, the circumstances causing the litigants delay must be "both

---

[2]     The Court also notes that the Relation Back Doctrine pursuant to Federal Rule of Civil Procedure 15(c) would not save Plaintiff's claims against Defendants. As noted in Defendant's brief, the Seventh Circuit has confirmed that "naming a John Doe defendant does not constitute a 'mistake' within the meaning of 15(c)(1)(C)(ii)." *Herrera v. Cleveland et al.,* 8 F.4th 493, 498 (7th Cir. 2021). However, the application of the equitable tolling doctrine removes this as a bar. *See, e.g.,* *Flowers v. Stec,* No. 20-cv-06498, 2023 WL 15474, at *3-5 (N.D. Ill. Jan. 2, 2023) (noting that the doctrine of equitable tolling may save a case filed outside of the statute of limitations period); *Foster v. Unknown Cook County Deputy Sheriff,* 914 F. Supp. 221, 224 at n.2 (N.D. Ill. Dec. 4, 1995) (stating that equitable tolling of the statute of limitations is not precluded by failure to meet the standards of the relation back doctrine).

extraordinary and beyond its control." *Mayberry v. Dittmann*, 904 F.3d 525, 529 (7th Cir. 2018) (quoting *Menominee Indian Tribe of Wisconsin v. United States*, 136 S. Ct. 750, 756 (2016)). Plaintiffs bear the burden to show both diligence and extraordinary circumstances. *See Herrera v. Cleveland*, 8 F.4th 493, 499 (7th Cir. 2021). The Court recognizes that equitable tolling is "rare "and courts extend this relief sparingly. *Id.*; *see also Xanthopoulos*, 991 F.3d at 831.

When a *pro se* plaintiff seeks "to identify unknown defendants," reasonable diligence exists if the plaintiff "filed a motion that would help him identify those defendants, and the statute of limitations expires while the motion is pending." *Bryan v. City of Chicago*, 746 F.3d 239, 243 (7th Cir. 2014). Extraordinary circumstances might include "legal disability, an irredeemable lack of information, or situations where the plaintiff could not learn of the identity of proper defendants through the exercise of due diligence." *See Dickerson v. City of Chicago*, Case No. 21-cv-2955, 2022 WL 3369271, at *5 (N.D. Ill. Aug. 16, 2022) (citing *Dandridge v. Cook County*, No. 12-cv-5458, 2013 WL 3421834, at *9 (N.D. Ill. July 8, 2013)).

The Court finds that Plaintiff diligently tried to ascertain the identity of DeWeese and Walker. Plaintiff had no way of knowing who was responsible for transferring her into a cell with Colapietro or what went into that decision, as the decision was made by Officers through email correspondence with the support of the facility's Offender 360 Program and the physical offender tags. Plaintiff had no access to any of these things. All Plaintiff knew is what happened to her – she was placed into a cell with Colapietro and that he sexually assaulted her while they were celled together. In Plaintiff's second

grievance, she requested as relief that she be informed "[w]ho was involved in deciding to place me in R6-CU-06" with [Colapietro]?" The ARB informed Plaintiff that she would be notified of the results of the facility's investigation into the incident. However, Plaintiff did not receive any information regarding the investigation's outcome.

Recognizing the complexity of her case, Plaintiff acquired counsel shortly after she filed this case in June 2020. Plaintiff and her counsel only learned about Walker's identity once Defendants' counsel produced the Internal Affairs Report on September 10, 2020. Counsel had previously filed a Motion for Leave to Serve A Subpoena to Identify Defendants Before the Statute of Limitation Runs on July 16, 2020. The Court found the motion moot on October 10, 2020, given that the scheduling order set out discovery standards for John Does. Recognizing that Plaintiff's circumstances were unique, Plaintiff's counsel attempted to meet and confer with Defendants' counsel to address the issue of identifying additional defendants. However, additional information was not forthcoming until the Court granted Plaintiff's renewed motion for limited discovery on January 25, 2021. Through the depositions ordered by the Court, Plaintiff learned of DeWeese's involvement, and she accordingly amended her complaint on April 11, 2021.

Given the facts reiterated above, the Court finds that Plaintiff satisfied the second prong of the test, thus allowing for the application of equitable tolling. The lack of substantive information from Defendants' counsel was a situation that was beyond Plaintiff's or her counsel's control. Plaintiff's counsel filed two separate motions to ascertain the identity of additional defendants and even attempted to confer informally via email with Defendants' counsel to no avail. Plaintiff and her counsel could not control

opposing counsel's response to these requests. Nevertheless, Plaintiff's counsel continuously sought out ways to facilitate cooperation. Repeated and constant attempts by her counsel to obtain this information is all that Plaintiff could control. Therefore, the Court will allow Plaintiff's claims against DeWeese and Walker to proceed.

**B.     *Plaintiff's Case Against Defendants***

Plaintiff asserts that Defendants Walker, Kink, DeWeese, and Goins violated her Eighth Amendment rights by failing to protect her from the assault that took place when she was double celled with fellow inmate Justin Colapietro. (Doc. 215); (Doc. 214).

Prison officials have a duty under the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners [.]" *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). To succeed on a failure to protect claim, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm and that the prison official acted with "deliberate indifference" to the inmate's health or safety." *Id.*

Demonstrating deliberate indifference towards a prisoner's safety requires a showing that individual prison officials had subjective knowledge of the risk of harm to the prisoner, which they personally disregarded. *See Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008). It is not enough that a reasonable person should have known that the prisoner was at risk; the official must actually know of and disregard the risk to incur culpability. *See Lewis v. Richards*, 107 F.3d 549, 552-553 (7th Cir. 1997). A prisoner may demonstrate that prison officials were aware of a specific, impeding, and substantial threat to their safety, by showing that [they] complained to prison officials about a specific threat to their safety. *See, e.g.*, *LaBrec v. Walker*, 948 F.3d 836, 843-844 (7th Cir. 2020)

(holding a jury could find prison guard's actual knowledge of a specific risk when the plaintiff repeatedly told the officers that he felt unsafe, and the guards knew the cellmate had previously assaulted a prior cellmate.) "Mere negligence (for example if a prison guard should know of a risk but does not) is not enough to state a claim for deliberate indifference under the Eighth Amendment." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). Thus, liability for failure to protect an inmate materializes only if the individual knew the inmate faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. *See Grieveson*, 538 F.3d at 777.

    1.    *Plaintiff's Case Against Defendant Walker*

Defendant Walker advances two reasons why the Court should grant summary judgment in his favor. (Doc. 210, p. 9-10). First, Walker asserts that Plaintiff cannot establish that he acted with deliberate indifference when he placed Plaintiff in cell R6:CY:06 as he was "unaware of any risk of harm to Plaintiff." *Id.* at p. 9. Second, Walker states he had no personal interaction with Plaintiff prior to making her cell assignment in the O360 program, and he was otherwise unaware that she is transgender and classified as vulnerable under IDOC regulations. *Id.* at p. 10. Plaintiff points to both circumstantial and direct evidence to demonstrate that Walker knew of Plaintiff's vulnerable designation when he made the cell assignment. (Doc. 215, p. 11-12). Accordingly, the Court finds that summary judgment is inappropriate.

Rarely, if ever, will an official declare, "I knew this would probably harm you, and I did it anyway!" *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Thus, courts have relied on circumstantial evidence to establish the requisite knowledge to meet the deliberate

indifference standard in failure to protect cases. *See, e.g.*, *Farmer*, 511 U.S. at 842 (stating that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including from circumstantial evidence."). *See also Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996) (noting that an official's actual knowledge of a substantial risk "[c]an be inferred by the trier of fact from the obviousness of the risk.").

Here, Plaintiff points to both direct and indirect evidence to support her case. As direct evidence, Plaintiff supplied the Court with Walker's investigative interview from September 14, 2018. (Doc. 224, Exh. 1). In the interview, Walker allegedly stated that he "was unsure how Finnegan got put into a cell with Colapietro because Finnegan ha[d] a tag marked vulnerable on the placement board." *Id.* at p. 2. Additionally, the report notes that Walker stated, "that if he placed Finnegan into a cell with another inmate it was by total accident." *Id.* Subsequently, at an Administrative Hearing on October 31, 2018, Walker stated to the Employee Review Board that Plaintiff "was clearly marked as vulnerable." (Doc. 224, Exh. 2, p. 2). He also stated that his name was on Plaintiff's tag, indicating that he had created Plaintiff's tag for the placement board. *Id.* These statements directly demonstrate that Walker had knowledge of Plaintiff's vulnerable status.

However, Plaintiff also provides the Court with substantial circumstantial evidence to find that Walker had the requisite knowledge to meet the deliberate indifference standard. Plaintiff indicates that Walker was made aware of Plaintiff's vulnerable designation in at least three different ways by virtue of his position as a placement officer at Lawrence. First, Plaintiff notes that IDOC's O360 computer system

showed that Plaintiff was vulnerable. *See, e.g.*, (Doc. 213, Exh. 1, p. 9:12-10:12, 14:22-16:19, 24:24-25:23) (noting Brookhart stating that ". . . my recollection is that [Plaintiff] was already declared vulnerable when she transferred to this [Lawrence] facility"). Plaintiff notes that Walker would have looked at O360 at least twice in connection with making Plaintiff's cell assignment – the first time on June 20, 2018, to double cell her and the second time when he went into O360 at 8:32 a.m. on June 21, 2018, to formally change her cell placement in the system. *See, e.g.*, (Doc. 215, Exh. 5, p. 85:22-87:2); (Doc. 211, Exh. 7, p. 35:12-36:24) (noting that Goins agreed that Walker "should have gone into O360 at least twice" in connection with Plaintiff's cell change). O360 also would have informed Walker that Colapietro was convicted of predatory criminal sexual assault, and thus Walker would know it was dangerous to double cell Colapietro with Plaintiff. *See, e.g.*, (Doc. 211, Exh. 4, p. 91:2-15) (noting that DeWeese replied that Walker could have determined Colapietro's prior history by looking at O360 on June 20th or June 21st).

Second, Plaintiff argues that Plaintiff's Form 303, a document that showed Plaintiff was transgender and designated vulnerable, would have provided him with knowledge about Plaintiff's status. (Doc. 215, p .12). The Form 303 also showed that Warden Kink made a final determination that Plaintiff should be single celled as opposed to double celled. *Id.* Defendant Kink stated in his deposition that after he signed the document in May 2018 that he would expect the placement office to have knowledge of the Form 303 determination. (Doc. 211, Exh. 8, p. 72:7-12). Kink noted that the information would have been distributed to the placement office electronically or in the office's physical mailbox where they would pick-up paperwork relevant to placements. *Id.* at p. 72:17-20.

Third, Plaintiff notes that "her vulnerable designation would have been clearly indicated on her 'tag' which was on a board in the placement office where Walker worked. According to IDOC Rule 30(b)(6), each prisoner housed in the facility has a tag that contains information about them relevant to making cell placement determinations. (Doc. 215, Exh. 3, p. 20:2-23:15, 38:16-39:20). The placement officer at each facility is responsible for making the tag for each new offender that arrives at Lawrence, within a day or so of arrival. *Id.* at p. 24:1-24:20.

Defendant Walker disputes these facts as constituting sufficient circumstantial evidence. (Doc. 210, p. 9). Walker states that he relied only on the placement tags, as they should have reflected each inmates' status from O360. *Id.* Walker stated that he was unsure at the time whether Plaintiff's tag indicated she was vulnerable, and if it had, he would have placed her in a single cell. (Doc. 210, Exh. 2 49:21-24); (Doc. 210, Exh. C., 51:8-9).

Plaintiff, however, points out that the Court need not accept his "self-serving account." (Doc. 215, p. 14). Plaintiff points to *Horshaw v. Casper*, 910 F.3d 1027 (7th Cir. 2018) as instructive on this point. In *Horshaw*, a Menard prisoner alleged that he sent a note to the warden explaining that he faced a risk of harm. 910 F.3d at 1029. However, the warden denied receiving the note and proffered evidence that even if his office had received the note that there would be an indication of receipt in the log. *Id.* The district court entered summary judgment in favor of the warden, but the Seventh Circuit reversed noting that Plaintiff was entitled to an inference at summary judgment that the prison mail system worked, and that a jury would not credit the warden's denial of

having received the note. Additionally, the Seventh Circuit refused to draw inferences in the warden's favor based on the evidence of his office's log or about what the warden would have done had he received the note. *Id.* at 1029-30. This case is similar. Walker knew, as the placement officer, that he was required to find out if Plaintiff was designated vulnerable, and many systems existed to ensure that Walker knew this critically important information. Plaintiff, at summary judgment is similarly entitled to an inference that the information systems designed to facilitate Walker's job duties worked.

Lastly, the Court is not persuaded by Walker's argument that he lacked the requisite knowledge of Plaintiff's vulnerable status because he had not directly interacted with her prior to making the double cell assignment. (Doc. 210, p. 9-10). In *Farmer*, however, the Supreme Court pointed out that a prison official can be found deliberately indifferent to an individual's risk of harm not only when they have knowledge of an excessive risk of attack personal to only him, but also when the official is aware of a risk of harm faced by all prisoners in such circumstances. 511 U.S. at 843. As a transgender inmate, Plaintiff belonged to an identifiable group of prisoners that are at a heightened risk for sexual abuse. *See, e.g.*, *Hampton v. Baldwin*, Case No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *2-3 (S.D. Ill. Nov. 7, 2018) (noting that IDOC was ordered to train all prison staff on transgender issues); *Perkins v. Martin*, Case No. 3:14-cv-00191-SMY-PMF, 2016 WL 3670564, at *3 (S.D. Ill. July 11, 2016) (citing *Farmer* and listing "transgender prisoner with female characteristics in male prison as a situation "where the prisoner plaintiff exhibits characteristics that make them more likely to be victimized"); *Doe v. District of Columbia*, 215 F.Supp.3d 62, 77 (D.D.C. 2016) (finding that a jury could infer that

prison officials "knew Doe faced a substantial risk of rape because of her status as a transgender woman."); *Zollicoffer v. Livingston*, 169 F.Supp.3d 687, 691 (S.D. Tex. 2016) (citing 2011 data from the Bureau of Justice Statistics, which "reported that 34.6% of transgender inmates reported being the victim of sexual assault," approximately nine times the rate of other prisoners, and stating that "[t]he vulnerability of transgender prisoners to sexual abuse is no secret."). By virtue of Defendant's knowledge of Plaintiff's membership in an established vulnerable group, Defendant's lack of personal interaction with Plaintiff is irrelevant.

### 2.   *Plaintiff's Case Against Defendants Goins, DeWeese, and Kink*

Defendants assert that Goins, DeWeese, and Kink all lacked sufficient knowledge of Plaintiff's substantial risk of serious harm as a transgender inmate. (Doc. 211, p. 10). However, Plaintiff argues that each of the Defendants did have sufficient knowledge of Plaintiff's vulnerable status.

Regarding Defendant Kink, Plaintiff asserts that a letter she sent from segregation, on June 6, 2018, stating that she had concerns about her safety gave Kink sufficient knowledge of her vulnerable status necessary to substantiate a failure to protect claim against him. (Doc. 214, p. 14-15). Specifically, Plaintiff told Kink about her "concerns and fears for her safety in general and of being raped due to being double celled with inmates she doesn't feel safe being locked in a cell with (*i.e.*, all male inmates she doesn't pick as cellmates), prior findings of vulnerability and single-cell status, and the need to remain single celled upon release from the segregation unit." (Doc. 1, p. 14). Kink admitted that he would get mail from prisoners when he was warden but did not maintain a log of

what was received. (Doc. 211, Exh. 8, p. 12:5-13:9). As warden, Kink acknowledged that he could have told his security staff about prisoners he believed were particularly vulnerable and he could have told staff they need to pay close attention to the prisoner in connection with housing and movement. (Doc. 214, Exh. 12, p. 19:2-15).

In *Hampton v. Kink*, the Court denied summary judgment against Defendant Kink in a similar case concerning a transgender inmate. Case No. 18-cv-550-NJR-MAB, 2021 WL 2580267 (S.D. Ill. June 23, 2021). There, Kink had issued a "keep separate form ("KSF")" order for the plaintiff and another inmate who sexually harassed her, but Lawrence staff claimed to not know about the KSF and allowed the harasser to have continued access to the plaintiff. *Id.* at *2. Ultimately, the Court in *Hampton* found that a jury could find Kink deliberately indifferent and allowed plaintiff's claim to proceed because Kink failed to educate his staff about the KSF order and ensure that the order was carried out. Similarly, here, Kink failed to notify placement about Plaintiff's obvious need to be single celled even when he received advance notice of her planned movement on June 20th. Kink did nothing to protect her. Accordingly, the Court finds that Plaintiff's claims against Kink may proceed.

The Court is similarly persuaded by Plaintiff's argument alleging that Defendant DeWeese had sufficient personal knowledge of the risk of harm to Plaintiff. In May and June 2018, DeWeese was the lieutenant in charge of Lawrence's segregation unit, where Plaintiff resided for the first month of her stay at Lawrence. DeWeese knew from working in Plaintiff's housing unit that she was transgender, designated vulnerable, and was required to be single celled. (Doc. 211, Exh. 4, p. 54:24-55:23). DeWeese recalled that he

had a personal interaction with Plaintiff, and he recalls her presenting as feminine. (Doc. 210, Exh. 2, p. 43:13-46:7). In combination with the fact that Walker informed DeWeese about his decision to move Plaintiff in an email on June 20,[3] but did not take issue with Plaintiff's move given his personal knowledge of Plaintiff's transgender identity, deliberate indifference can be inferred.

The Court, however, is not equally persuaded by Plaintiff's argument about Goins having substantial knowledge necessary for a failure to protect claim. Plaintiff acknowledges that Goins does not have the same level of knowledge as DeWeese, Walker, or Kink – but seemingly argues that his position as the Assistant Warden of Operations, who was in charge of ensuring that Walker knew what his responsibilities were with respect to making cell assignments – suffices as personal involvement in this case. (Doc. 214, p. 17). However, Plaintiff does not put forth any evidence that Goins did not appropriately train Walker. Plaintiff only notes that Goins knew the office was understaffed. She does not put forward any specific facts to show that Goins's oversight over Walker was insufficient. Thus, Plaintiff's claims must fail.

Liability under Section 1983 is direct, not vicarious. Section 1983 requires personal responsibility to establish personal liability. That is, only a defendant's direct, personal

---

[3]     Defendants attempt to downplay the significance of Walker's emailed cell change memo by pointing out that several other officers were also copied on the email. (Doc. 211, p. 11). However, Warden Kink and Brookhart both testified that staff in DeWeese's position were expected to read such emails and speak up if they identify issues with an individual's new cell assignment. *See, e.g.,* (Doc. 211, Exh. 8, p. 73:6-78:17) (noting Kink stating that "if something was out of line and needed to be changed [someone should speak up]"); (Doc. 214, Exh. 5, p. 89:10-90:5) (noting that "Warden Brookhart expected people on the cell change distribution list to read the cell change memo and raise concerns; it takes a village to make sure that everything is working the way it should.").

involvement in a constitutional violation can result in liability. *See, e.g., Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (stating that "[i]t is well established that '[f]or constitutional violations under § 1983 . . . a government official is only liable for his or her own misconduct."). The same rule applies to those at the top of the pyramid who oversee other individuals. "To recover damages against a prison official in a supervisory role, a § 1983 plaintiff may not rely on a theory of respondeat superior and must allege that through their own conduct that they violated the constitution." *Id.* As previously stated, this means that the defendant must have had actual, personal knowledge of the risk to the prisoner. *See, e.g., Stockton v. Milwaukee County*, 44 F.4th 605, 619 (7th Cir. 2022) (stating that "Stockton must demonstrate that Madden's injury occurred at Clarke, Schmidt, and Evan's direction or with their knowledge and consent that the defendants acted 'either knowingly or with deliberate, and reckless indifference.'") (quoting *Backes v. Vill. of Peoria Heights, Ill.*, 662 F.3d 866, 870 (7th Cir. 2011)). Plaintiff has not met this standard regarding her allegations against Goins. Therefore, the grant of summary judgment in favor of Goins is appropriate.

## C. *Defendants' Qualified Immunity Defense*

All Defendants claim they are protected by qualified immunity. Government officials performing discretionary functions are generally shielded from liability for civil damages if their conduct does not violate clearly established constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). To determine whether qualified immunity applies, the court must consider: (1) whether a constitutional violation has occurred on the facts alleged; and (2) whether the right alleged to have been violated is clearly

established. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001).

The law is clearly established that prison officials have a duty to protect inmates from abuse by other prisoners. *See Gevas v. McLaughlin*, 798 F.3d 475, 484 (7th Cir. 2015). In *Balsewicz*, the Seventh Circuit confirmed that *Farmer* forecloses the qualified immunity defense in failure to protect cases. *See Balsewicz v. Pawlyk*, 963 F.3d 650, 657 (7th Cir. 2020). *See also Velez v. Johnson*, 395 F.3d 732, 734-736 (7th Cir. 2005) (denying qualified immunity for a guard who failed to protect a detainee from sexual assault by his cellmate, characterizing the right at issue as "the right to be free from deliberate indifference to rape and assault" and finding that there "should be no debate" that it was a clearly established right as of 1999).

Regarding the second prong, whether Defendants took adequate steps to protect Plaintiff from sexual assault, that is a matter of factual dispute. Accordingly, granting qualified immunity at this time would be improper at the summary judgment stage. *See Hampton,* 2021 WL 2580267, at *14 (citing *Mordi v. Zeigler*, 770 F.3d 1161, 1164 (7th Cir. 2014)).

CONCLUSION

For the reasons outlined above, the Court **DENIES** Defendant Walker's Motion for Summary Judgment (Doc. 209). The Court also **GRANTS IN PART** and **DENIES IN PART** the Motion for Summary Judgment filed by Defendants DeWeese, Goins, and Kink (Doc. 211). The Court **GRANTS** the Motion as to Defendant Goins. However, the Court **DENIES** the Motion as to DeWeese and Kink. The Court directs the Clerk of Court to enter judgment accordingly at the conclusion of the case.

IT IS SO ORDERED.

DATED:  March 29, 2024.

Digitally signed by
Judge Sison
Date: 2024.03.29
16:37:37 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**